# UNITED STATES BANKRUPTCY COURT
## FOR THE
## DISTRICT OF MASSACHUSETTS

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

In re
**PROGRESSION, INC.,**                                    Chapter 11
     Debtor                                    Case No. 15-12679-JNF

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

**LYNNE F. RILEY, Chapter 7 Trustee,**
     Plaintiff
v.                                                        Adv. P. No. 16-1059
**LEXMAR GLOBAL INC.,**
     Defendant

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

## MEMORANDUM

## I. INTRODUCTION

The matter before the Court is the Motion to Dismiss Trustee's Complaint filed by

LexMar Global Inc. ("LexMar" or the "Defendant") pursuant to Fed. R. Civ. P. 12(b)(1).

LexMar also sought dismissal under Fed. R. Civ. P. 12(b)(7), but requested that the Court

defer ruling on that ground at the hearing held on July 27, 2016.  Lynne Riley, the Chapter

7 trustee (the "Trustee") of the the debtor, Progression, Inc. ("Progression" or the

"Debtor"), a Delaware corporation, filed an Objection to the Motion to Dismiss her single

1

count Complaint in which she seeks to hold LexMar liable for Progression's obligations to its creditors under a successor liability theory.

Pursuant to its Motion, LexMar seeks dismissal of the Complaint with prejudice for lack of subject matter jurisdiction. It contends that the Trustee does not have standing to bring a claim for successor liability because the claim is not property of the estate. It reasons that the Debtor could not bring a successor liability claim against it at the commencement of the case due to its failure to assert a successor liability claim as a compulsory counterclaim in a state court action it filed against the Debtor, Joshua E. Davidson, the Debtor's former president, and Vaughn E. Davis, the Debtor's former Chairman of the Board. LexMar also contends that the Trustee cannot assert a successor liability claim on behalf of non-innocent creditors which it asserts are included in the Debtor's amended schedule of liabilities, as the claims of the so-called "non-innocent creditors," namely TSG Progression Investment, LLC, TSG Equity Partners, LLC, and Joshua Davidson.[1]

The Court, as noted, heard the Motion and Objection on July 27, 2016 and took the matter under advisement. According to the court in <u>Portland Pipe Line Corp. v. City of South Portland</u>, 164 F.Supp.3d 157 (D. Me. 2016),

> Under Rule 12(b)(1), a court must dismiss a case over which it lacks subject matter jurisdiction. Fed. R. Civ. P. 12(b)(1). The plaintiff, as the party asserting subject matter jurisdiction, has the burden of demonstrating its

---

[1] Square 1 Bank, Massachusetts Growth Capital Corp., TSG Progression Investment, LLC, whose managing member was TSG Equity Partners, LLC (the "prior lenders"), Lexmar Investors LLC, an affiliate of LexMar, and the Debtor were parties to an Intercreditor Agreement which the prior lenders agreed that they could not exercise any remedy, including a lawsuit, against the collateral while amounts were owing to LexMar.

existence. <u>Aversa v. United States</u>, 99 F.3d 1200, 1209 (1st Cir. 1996). . . .
[T]he Plaintiffs bear the burden of establishing both standing and ripeness.
<u>Lujan v. Defenders of Wildlife</u>, 504 U.S. 555, 561, 112 S.Ct. 2130, 119 L.Ed.2d
351 (1992) (standing); <u>R.I. Ass'n of Realtors v. Whitehouse</u>, 199 F.3d 26, 30
(1st Cir. 1999) ("The burden of establishing standing rests with the party
who invokes federal jurisdiction"); <u>id.</u> at 33 ("[T]he plaintiff must adduce
facts sufficient to establish both fitness and hardship"). In determining
whether jurisdiction is proper, a court must construe the alleged facts in the
plaintiff's favor, and it may consider extrinsic materials. <u>Aversa</u> at 1209–10,
("In ruling on a motion to dismiss for lack of subject matter jurisdiction
under Rule 12(b)(1), the district court must construe the complaint liberally,
treating all well-pleaded facts as true and indulging all reasonable
inferences in favor of the plaintiff. In addition, the court may consider
whatever evidence has been submitted . . . ." (citations omitted).

<u>Portland Pipe Line Corp.</u>, 164 F.Supp.3d at 173-74.  *See also* <u>Gonzalez v. U.S.</u>, 284 F.3d 281,

288 (1st Cir. 2002).[2]   In view of the authority referenced above, the Court may consider

the numerous exhibits attached to the Complaint and the Motion.

---

[2] In <u>Gonzalez</u>, the court stated:

> The attachment of exhibits to a Rule 12(b)(1) motion does not convert it to
> a Rule 56 motion.  While the court generally may not consider materials
> outside the pleadings on a Rule 12(b)(6) motion, it may consider such
> materials on a Rule 12(b)(1) motion, such as the one in this case. <u>Heinrich v.
> Sweet</u>, 44 F.Supp.2d 408, 412 (D. Mass. 1999); <u>White v. Comm'r of Internal
> Revenue</u>, 899 F.Supp. 767, 771 (D. Mass. 1995) ("The Court can look beyond
> the pleadings—to affidavits and depositions—in order to determine
> jurisdiction.") (citing Charles A. Wright & Arthur R. Miller, Federal Practice
> and Procedure: Civil § 1363 (1990)).

<u>Gonzalez</u>, 284 F.3d at 288.

## II. THE TRUSTEE'S COMPLAINT[3] AND RELATED EVENTS

Through her Complaint, the Trustee seeks to hold LexMar liable for the Debtor's

obligations to its creditors under a successor liability theory because

> Defendant having acquired Progression's business assets through a secured
> party foreclosure sale conducted by an affiliate of Defendant, and thereafter
> having continued to operate the Debtor's business in the same manner as it
> had been operated by Progression before the secured party sale, in the same
> locations, with many of the same employees, selling the same products,
> using the same trade names and phone and fax numbers, and expressly
> holding itself out to the stream of commerce as the entity that "continues to
> develop, innovate and service the Progression product line."

Complaint at ¶ 1.  Specifically, the Trustee alleged that Progression was founded in 2002

by Vaughn Davis and Scott Marino.  It operated from its location at 22 Parkridge Road,

Haverhill, Massachusetts from February 28, 2011 through September 10, 2014 when it

ceased conducting business.  It manufactured and developed, among other things,

nuclear magnetic resonance imaging spectroscopy analyzers, laser-induced breakdown

spectroscopy analyzers, and electrostatic sensors and monitors - - devices used in the

petrochemical, mining and mineral processing industries. It marketed and sold its

devices under the brand and trade name "Progression."

In March, 2014, Progression obtained $1,000,000 of working capital financing (the

"Loan") from LexMar Investors LLC ("Investors") pursuant to a Loan Agreement dated

March 21, 2014.  To secure repayment of the Loan, Progression granted Investors a

---

[3] The Court has reproduced verbatim numerous allegations set forth in the Trustee's
Complaint and and paraphrased other allegations.

security interest in substantially all of its assets pursuant to a Security Agreement dated March 21, 2014.  The Loan had a maturity date of August 15, 2014.

Progression failed to repay the Loan on its maturity date.  On or about August 22, 2014, Investors notified Progression that Investors was scheduling a secured party sale of its collateral (the assets of Progression in which Progression had granted Investors a security interest) by public auction scheduled for September 12, 2014 at 12:00 noon (the "Secured Party Sale").

On or about September 10, 2014, Stephen Garrow and David Vogel, the principals of Investors, caused LexMar to be formed as a Delaware corporation.  On September 12, 2014, Investors conducted the Secured Party Sale at which it submitted a credit bid of $1,000,000 and was determined to be the high bidder, thus acquiring Progression's assets in which Investors held a security interest (the "Purchased Assets").  Shortly after acquiring the Purchased Assets at the Secured Party Sale, Investors sold or otherwise transferred title to the Purchased Assets to LexMar or otherwise permitted LexMar to exercise control over the Purchased Assets.[4]  Prior to acquiring the Purchased Assets, LexMar had no material assets and was not engaged in any business enterprise.

---

[4] LexMar attached to its Motion to Dismiss Complaint a copy of a "Bill of Sale Pursuant to UCC Sale" which set forth, in relevant part, the following:

 . . . a public sale was conducted at the offices of Foley & Lardner, LLP on September 12, 2014 at 12:00PM E.D.T. (the "Sale") and that LexMar Global Inc. ("**Buyer**"), a Delaware corporation and assignee of the Senior Secured Lender, purchased the Property at the Sale for the credit bid of $1,000,000, this Bill of Sale is hereby issued effective as of September 12, 2014 (the "**Effective Date**"):

At all relevant times since acquiring the Purchased Assets from Investors, LexMar has owned and/or exercised control over the Purchased Assets and has continued the business enterprise that Progression conducted prior to the Secured Party Sale. LexMar has continued to manufacture and service the same products that Progression had manufactured and serviced, using the same names for its products that Progression had utilized for its products.

Prior to September 12, 2014, Progression maintained a website with a uniform resource locator ("URL") (i.e., the website address) of "www.progression-systems.com" (the "Website"). Shortly after it acquired the Purchased Assets, LexMar modified the Website to reflect its control of the Purchased Assets and the modified Website has been maintained by LexMar with the URL of "www.lexmarglobal.com" (the "Modified Website"). Internet searches utilizing the URL for the Website ("www.progressionsystems.com") maintained by Progression prior to September 12, 2014 are automatically redirected to the Modified Website maintained by LexMar since it

---

That pursuant to the Loan Agreement, Security Agreement, Sale and operation of law, the Property, more particularly described in Exhibit 1 attached hereto, is hereby transferred, conveyed and assigned to the Buyer, its successors and assigns, **TO HAVE AND TO HOLD** for their own use forever, all of the Borrower's right, title and interest in and to the Property, free and clear of all liens, claims, security interests as provided in Article 9 of the the UCC, but otherwise **"AS IS" WITH ALL FAULTS, AND WITHOUT ANY REPRESENTATIONS OR WARRANTIES OF ANY NATURE, INCLUDING BUT NOT LIMITED TO THOSE EXPRESS, IMPLIED OR STATUTORY AND WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE.**

acquired the Purchased Assets. The Website that had been utilized by Progression is no longer accessible except in the form of the Modified Website maintained by LexMar. LexMar has caused, or its actions incident to creating the Modified Website have caused, internet searches for Progression to lead to Defendant's website.  The Modified Website maintained by LexMar expressly states that it "continues to develop, innovate and service the Progression product line." The Modified Website contains much of the same information as the Website contained prior to LexMar taking control of the Website and causing its modification to the Modified Website, and Progression products are the only products mentioned by Defendant on the Modified Website.

In addition, technical information for LexMar's products maintained on the Modified Website is the same technical information that Progression maintained on the Website concerning the Progression Products.  Moreover, pictures of LexMar's products as shown on the Modified Website show the "Progression" logo on pictured products. Similarly, LexMar maintains numerous "application notes" detailing the specific applications for which its products can be utilized and these application notes, which are identical to the ones employed by Progression, contain the "Progression" logo and does not refer to LexMar.

During the period August 2014 through the date of the Secured Party Sale, Stephen Garrow and David Vogel, the principals of each of Investors and LexMar, spoke with many of Progression's employees about employment with the entity to be formed to own operate the Purchased Assets (i.e., LexMar, upon its formation and acquisition of the Purchased Assets).  Incident to acquiring the Purchased Assets, Defendant hired over half

of Progression's workforce and commenced to operate Progression's business almost exactly as it had been operated by Progression prior to the Secured Party Sale.

LexMar operates its business from the same location where Progression operated prior to the Secured Party Sale, and it entered into a lease with the owner of the business location on essentially the same terms under which Progression leased the business location prior to the Secured Party Sale.  In addition, LexMar has maintained a mailbox with Progression's name on it at the Progression's former location.

After acquiring the Purchased Assets, LexMar completed performance of Progression's pending contracts for delivery of products, and entered into new contracts that had been in prospect for Progression prior to the Secured Party Sale.

At all relevant times prior to September 12, 2014, Progression utilized the telephone number (978) 556-9555 and the fax number (978) 556-9551.  LexMar has, since acquiring the Purchased Assets, utilized this same phone number and fax number that Progression used as reflected on the Modified Website Contact Page accessible from the Home Page.

Before ceasing business operations on September 10, 2014, Progression utilized the sales and service agents in the following locations:  Al Khobar, Saudi Arabia; Bangkok, Thailand; Hong Kong, China; New Delhi, India; Sao Paulo, Brazil; Seoul, South Korea; and Tokyo, Japan.  Since acquiring the Purchased Assets, LexMar has utilized these same sales and service agents, as reflected by the Modified Website Contact Page.  Before ceasing business operations on September 10, 2014, Progression maintained service locations in: Brussels, Belgium; Houston, Texas (USA); Shanghai, China; and Haverhill,

8

Massachusetts. LexMar, since acquiring the Purchased Assets, has utilized these same service locations, as reflected by the Modified Website Contact Page.

The Modified Website lists Scott Marino as "Co-Founder & President" of LexMar, as reflected by the Modified Website "Team Page," accessible from the Home Page. Scott Marino, as noted above, was a co-founder of Progression. At all relevant times prior to the Secured Party Sale, Scott Marino served as Progression's President or President—Petrochemical. Moreover, the Modified Website Home Page link to "About Us" lists six "Significant Events" in the purported business life of LexMar, five of which occurred before the organization of LexMar in September 2014, and refer to significant events in Progression's business life.

After the Secured Party Sale, LexMar paid selected creditors of Progression to facilitate its seamless continuation of Progression's business operations. Notably, LexMar utilized funds in Progression's bank account with Citizens Bank to pay Progression's liability to Comcast for telephone service in order that LexMar could maintain uninterrupted telephone service utilizing the phone number assigned to Progression. LexMar also paid debts owed to other Progression vendors and utilized Progression's credit accounts with vendors, whose goods and services were critical to producing Progression products scheduled for delivery under Progression's pending contracts.

LexMar held itself out to Comcast and other vendors as a mere continuation of Progression that would assume and perform Progression's contractual obligations to such vendors. After LexMar acquired control of the Purchased Assets, emails sent to

9

former Progression employees whom LexMar employed were automatically redirected or forwarded to such individuals at their new email accounts maintained by LexMar.

On or around November 4, 2014, less than two months after the Secured Party Sale, LexMar filed a Verified Complaint in the Suffolk Superior Court, Department of the Trial Court against Progression and its principal officers, namely its President, Joshua Davidson ("Davidson"), and its Chairman of the Board and co-founder, Vaughn Davis ("Davis"). Pursuant to its Verified Complaint, LexMar sought "to enforce its rights under foreclosure sale of loan collateral and non-solicitation and non-competition covenants and for statutory and common law claims and equitable remedies." LexMar sought the following injunctive relief 1) requiring Davidson and Davis to cease violation of their binding contractual non-solicitation obligations; 2) requiring Davidson to cease interference with LexMar's banking relationships; 3) requiring Davidson to cease interference with mail delivery to LexMar; 4) requiring Davidson and Davis to cease violating their binding contractual non-competition obligations; and 5) compelling Davidson to return computers, confidential documents, and other tangible property to LexMar. In its Verified Complaint, LexMar employed the following headings to organize its factual allegations in support of its twelve counts, only two of which were against the Debtor: 1) Progression Gives LexMar a Broad Security Interest in Return for Financing; 2) the Post-Default Foreclosure and Public Sale; 3) Davidson's Employment Agreement; 4) Davis's Confidentiality and Non-Competition Agreement; 5) Defendants' Post-Foreclosure Breaches and Interference with LexMar's Rights; 6) Davidson Interferes with Bank Accounts and Takes Cash; 7) Davidson Interferes with the Delivery of Mail to

LexMar; 8) Davidson's and Progression's Breaches of the Loan Documents; 9) Davidson's and Davis's Misappropriation of Confidential Information and Breach of Their Non-Solicitation and Non-Compete Obligations; 10) Davidson Disregard's [sic] Demands to Cease and Desist.

With respect to Progression, LexMar formulated two counts, one for breach of contract and the other for specific performance. With respect to Count XII, the breach of contract count, it alleged:

> Progression and LexMar Investors entered into the Loan Documents, which provide, *inter alia,* for
>
>> a. a security interest in the Intellectual Property; and
>> b. payments of principal, interest, and penalties as required under the Loan Documents.
>
> Pursuant to the foreclosure and Bill of Sale, the Assets, Including [sic] the Intellectual Property and LexMar Investors' rights under the Loan Documents belong to LexMar.
>
> LexMar and LexMar Investors have performed all of their obligations under the Loan Documents, and all conditions precedent have occurred or have been performed.
>
> Progression has breach [sic] its obligations under the Loan Documents by failing to:
>
>> a. execute assignments of the Intellectual Property for filing with, *inter alia*, the United States Patent and Trademark Office; and
>>
>> b. pay the principal, interest, penalties, and other amounts due under the Loan Documents, which amounts including the additional sums invested in August and September 2013, which were not satisfied by the foreclosure and disposition of the Assets.
>
> As a direct and proximate result of Progression's breaches, LexMar has suffered damages in an amount to proven [sic] at trial.

(paragraph numbers omitted).  With respect to Count XII through which LexMar sought specific performance, it alleged that Progression's failure to execute assignments of its Intellectual Property for filing with the United States Patent and Trademark Office entitled it to specific performance.

In its state court action, in addition to filing a Verified Complaint, LexMar filed a motion for a temporary restraining order and a preliminary injunction.  On November 18, 2014, Judge Billings issued a "decision and order on cross-motions for preliminary injunction" [sic] and, according to the Trustee, stated in a written opinion addressing the parties' competing claims for relief that "[a]t least two key employees of Progression … are now employed by [Defendant] and are working to continue the business of Progression using the acquired assets."[5]

The defendants in the state court action were represented by the same attorney, Andrew P. Botti, Esq. ("Attorney Botti").  On December 5, 2014, approximately seven months before the Debtor commenced its bankruptcy case, Attorney Botti filed an Answer and Affirmative Defenses on behalf of the defendants.  The defendants denied the allegations in the Complaint and set forth 13 affirmative defenses, including the following: "Defendants reserve the right to file such additional defenses and actions as may be appropriate."  None of the defendants asserted a counterclaim.

---

[5] Neither the Trustee nor LexMar submitted a copy of the decision dated November 18, 2014 and the state court docket does not reflect the filing of a motion for a preliminary injunction by the defendants.

Progression has not engaged in business operations since September 10, 2014. Following the Secured Party Sale, Progression began the process of winding down its remaining business and financial affairs.   On July 7, 2015, it filed a voluntary petition commencing its Chapter 7 case.   On July 27, 2015, Progression filed its schedules and statements with this Court, listing a single asset on Schedule B-Personal Property, namely a claim for successor liability in an uncertain amount. On August 7, 2015, Progression filed its amended Schedule F and related summary of liabilities with this Court in which it scheduled liabilities to known creditors totaling $2,694,306.72.

In the state court action, there was little activity following the filing of the defendants' answer.   The parties filed a "Joint Rule 16 Statement on December 9, 2014 which the court approved.   On June 11, 2015, approximately one month before the commencement of the Debtor's Chapter 7 case, LexMar moved to extend time to comply with the scheduling order.   Following the filing of the petition, Progression did not promptly file a Suggestion of Bankruptcy.  On January 6, 2016, the state court conducted a status conference.   Approximately two months later, on March 31, 2016, the parties in the state court action filed a "Stipulation of Dismissal as to all Parties," pursuant to Mass. R. Civ. P. 41(a)(1).   In the Stipulation, they stated the following:

> All parties to this action, through undersigned counsel and pursuant to the provisions of Mass. R. Civ. P. 41(a)(1), hereby stipulate and agree that all claims and counterclaims asserted by and against Plaintiff LexMar Global Inc. and Defendants Joshua E. Davidson, Vaughn E. Davis, and Progression, Inc., however designated, shall be and the same are hereby dismissed without prejudice in their entirety, the dismissed parties waiving all rights of appeal, and with each dismissed party to bear its own costs and fees.

13

The Stipulation was signed by Attorney Botti on behalf of the the defendants, including

the Debtor, although Attorney Botti was not employed by the Trustee as Special Counsel

to act on her behalf in the state court action.  Although the case was dismissed on March

31, 2016, it appears a Suggestion of Bankruptcy may have been filed on April 4, 2016.

Based upon the allegations set forth in her Complaint, the Trustee formulated a

single count for successor liability, stating the following:

> Since acquiring the Purchased Assets, Defendant has engaged in business
> as the mere continuation of Progression.
>
> The circumstances surrounding Defendant's acquisition and utilization of
> the Purchased Assets created the de facto merger of Progression and
> Defendant.
>
> Defendant is liable for Progression's obligations to its creditors in the
> aggregate amount of the Scheduled Liabilities.
>
> Plaintiff is entitled as trustee of Progression's bankruptcy estate to hold
> Defendant liable for, and to recover from Defendant the amount of, the
> Scheduled Liabilities.

## III. POSITIONS OF THE PARTIES

A. <u>LexMar</u>

According to LexMar, the Trustee's Complaint should be dismissed with prejudice

for lack of subject matter jurisdiction pursuant to Fed. R. Civ. P. 12(b)(1) because the

Trustee does not have standing to bring a claim for successor liability where such a claim

is not property of the estate.  In its view, the claim for successor liability is not property

of the estate because the Debtor could no longer bring such a claim on the petition date,

having failed to assert the claim, which it contends is a compulsory counterclaim, in the

prepetition state court action in which it was named as a defendant.  LexMar argues that

the successor liability claim now asserted by the Trustee was compulsory because it arises

out of the same transaction or occurrence which formed the basis of the counts it asserted

in its state court complaint against Progression.  It adds:

> [I]f the Complaint is not dismissed for the reasons stated above, it should
> be dismissed (without prejudice) for lack of subject matter jurisdiction
> pursuant to Fed. R. Civ. P. 12(b)(1). Under applicable Massachusetts law
> regarding successor liability, the Trustee cannot assert a successor liability
> claim on behalf of non-innocent creditors. The Complaint purports to state
> a claim for all debts set forth in the Debtor's amended schedule of liabilities,
> which includes claims by creditors who would not be entitled to the
> equitable relief of a successor liability claim had they asserted (or were they
> to assert) such claims themselves.

LexMar expands its argument by observing that a valid claim for successor liability may

be considered property of the estate pursuant to 11 U.S.C. § 541, but that in this adversary

proceeding, this Court should not reach the merits because the Trustee is barred from

asserting the successor liability claim as a matter of substantive and procedural

Massachusetts law.  Specifically, it argues that, because the Debtor failed to raise the claim

as a compulsory counterclaim in its answer and affirmative defenses to LexMar's

prepetition lawsuit, the Debtor and the Trustee, who stands in the shoes of the Debtor,

are barred from asserting the claim now, noting that as a result, the successor liability

claim was not part of the bankruptcy estate.  Accordingly, LexMar asserts that the Trustee

lacks standing to bring the claim on behalf of the creditors, and this Court should grant

its Motion to Dismiss with prejudice pursuant to Fed. R. Civ. P. 12(b)(1).

According to LexMar, a comparison of its state court complaint and the Trustee's

Complaint establishes that the successor liability claim arose out of the same transaction

or occurrence that was the subject matter of Defendant's breach of contract and specific

performance claims against Debtor. The state court complaint contained descriptions of

the Debtor's default, the Article 9 Secured Party Sale by which LexMar obtained

substantially all of the Debtor's assets, and set forth the basis of the breach of contract and

specific performance claims.  LexMar also maintains:

> [N]early all the facts alleged in the Trustee's Complaint were known to the
> Debtor and Davidson prior to the filing of their answer to the State Court
> Complaint on December 4, 2014 [sic]. For example, in an Affidavit filed by
> Davidson on November 11, 2014, Davidson stated that LexMar Investors
> foreclosed on the Debtor and was exercising control over the Debtor's
> assets (Exhibit 10, Davidson Affidavit at ¶¶ 24-29; 33). Additionally, at the
> Section 341 Meeting of creditors, on December 10, 2014 [sic], Davidson
> described the Article 9 sale by which Defendant obtained control over the
> Debtor's asserts [sic] and further asserted that there was a "de facto merger"
> between the Defendant and the Debtor by which the Defendant continued
> the business of the Debtor.

(footnote omitted).[6]  It adds that because the Debtor failed to raise the successor liability

claim at the time of its Answer it either ceased to exist as an asset of the Debtor or became

an asset the Debtor and the Trustee would be barred from pursuing.  It concludes that

"[u]nder either approach, the Trustee therefore lacks standing to pursue the SL [successor

liability] Claim which the Debtor could not pursue at the time the bankruptcy Petition

---

[6] Davidson, in his Affidavit, represented he would be responsible for winding up the
affairs of the Debtor without pay. In his Affidavit, he stated that "LexMar was using
Progression's bank account at Citizens Bank to pay Progression vendors – specifically its
overdue phone bill with Comcast which Progression had not[sic] need to keep active."
He also stated that LexMar "has improperly been using Progression credit arrangements
with vendors to procure materials, thereby increasing Progression's liabilities." The
Debtor filed its Chapter 7 petition on July 7, 2015 so what Davidson may have stated at
the section 341 meeting, which was held on December 10, 2015, not December 10, 2014,
would not bear on the compulsory counterclaim where the Answer had been filed in the
state court action and after the entry of the order on November 18, 2014, little activity
took place in the state court action.

was filed," adding "the Court therefore has no subject matter jurisdiction over the SL

Claim. Thus, Trustee's Complaint should be dismissed with prejudice for lack of subject

matter jurisdiction pursuant to Fed. R. Civ. P. 12(b)(1)."

B. <u>The Trustee</u>

The Trustee asserts that "Lexmar [sic] has attempted to fabricate grounds for

dismissal out of matters largely irrelevant to the Complaint."  She argues that despite

LexMar's irrelevant contentions, she has standing to assert causes of action that belong

to the bankruptcy estate, including those causes of action created or authorized by the

Bankruptcy Code. *See, e.g.,* 11 U.S.C. §§ 541(a), 542, 544, 547, 704.  She maintains that the

successor liability claim asserted by the Trustee is "indisputably property of the Estate,

both because it was property owned by Progression at the time Progression filed its

bankruptcy petition, and because the Trustee is the person now entitled to assert the

successor liability claims that, prepetition, were held by Progression's various creditors."

The Trustee contends that, despite LexMar's admission that Progression owned the

successor liability claim, and should have asserted it in the state court action, the

dismissal of that action without prejudice precludes any argument by LexMar that the

successor liability claim has been extinguished, or that the Trustee is barred from

asserting it.  Therefore, citing <u>In re Emoral, Inc.</u>, 740 F.3d 875, 881 (3d Cir.), *cert. denied sub*

*nom.* <u>Diacetyl Plaintiffs v. Aaroma Holdings, LLC</u>, 135 S. Ct. 436, 190 L. Ed. 2d 328 (2014),[7]

---

[7] The court in <u>Emoral, Inc.</u> stated:

Just as the purpose behind piercing the corporate veil, however, the
purpose of successor liability is to promote equity and avoid unfairness,

she maintains that the claim belongs to the bankruptcy estate, *see* 11 U.S.C. § 541(a), and

she has standing to assert it.  *See* 11 U.S.C. § 704(a).

The Trustee relies upon the dismissal of the state court action without prejudice

arguing that "[u]nder Massachusetts law, a 'dismissal without prejudice does

not preclude a second action on the same claim and issues'"[8] and has no preclusive effect of

any kind as to claims that were asserted or that were not asserted in the state court action,

---

and it is not incompatible with that purpose for a trustee, on behalf of a debtor corporation, to pursue that claim. *See* Phar–Mor, Inc., 22 F.3d at 1240 n. 20; *see also* Baker v. Nat'l State Bank, 161 N.J. 220, 227–28, 736 A.2d 462 (1999) (discussing successor liability and holding that it requires a "fact specific and equitable analysis"); Walensky v. Jonathan Royce Int'l, Inc., 264 N.J.Super. 276, 284, 624 A.2d 613 (App. Div. 1993) (holding that "the doctrine of successor liability exists to protect against [ ] inequities"). As in Keene Corp. and Buildings by Jamie, the Diacetyl Plaintiffs' cause of action against Aaroma would be based on facts generally available to any creditor, and recovery would serve to increase the pool of assets available to all creditors. Therefore, the District Court appropriately classified that cause of action as a generalized claim constituting property of the estate. *See also* In re OODC, LLC, 321 B.R. 128, 136 (Bankr. D. Del. 2005) (holding that the bankruptcy trustee had standing to pursue successor liability claims because the claims were general and common to all creditors, noting that "most other courts have found that the trustee in bankruptcy has standing to bring successor liability (or alter ego) suits on behalf of all creditors").

In re Emoral, Inc., 740 F.3d 875, 881 (3d Cir.), *cert. denied sub nom*. Diacetyl Plaintiffs v. Aaroma Holdings, LLC, 135 S. Ct. 436, 190 L. Ed. 2d 328 (2014). *See also* In re Ontos, Inc., 478 F.3d 427, 432-33 (1st Cir. 2007).

[8] She cites Morgan v. Evans, 39 Mass. App. Ct. 465, 470, 657 N.E.2d 764, 768 (1995)( citing 9 Wright & Miller, Federal Practice & Procedure Civil 2d § 2367, at 321 (1995) ("A voluntary dismissal without prejudice leaves the situation as if the action had never been filed."); and Nat'l R.R. Passenger Corp. v. Int'l Ass'n of Machinists & Aerospace Workers, 915 F.2d 43, 48 (1st Cir. 1990) ("it is well settled that '[t]he effect of a voluntary dismissal without prejudice is to render the proceedings a nullity and leave the parties as if the action had never been brought.' ").

including without limitation any claims that might have constituted compulsory counterclaims for purposes of the state court action.

The Trustee further contends:

The "transaction" at issue in the State Court Action was the Secured Party Sale, and the exact scope of property rights acquired by Lexmar. The "transaction" at issue in the Complaint (and that would have been at issue in any successor liability claim that might have been brought by any creditor of Progression outside of bankruptcy) is Lexmar's ongoing operation of the business enterprise previously operated by Progression. The disputes at issue in the State Court Action simply have nothing to do with, and would have no bearing on, the determination of whether Lexmar would be liable to Progression's creditors on a theory of successor liability. A successor liability claim would seek determination of whether Lexmar's business enterprise was the mere continuation of Progression's business enterprise—a determination that has nothing to do with whether the State Court Action defendants were interfering with Lexmar's property rights in the assets it acquired through the Secured Party Sale.

## IV. DISCUSSION

LexMar's Motion to Dismiss is predicated upon the Trustee's lack of standing and a concomitant lack of jurisdiction owing to Progression's failure to assert a compulsory counterclaim against it in its state court action commenced on November 4, 2014. *See* U.S. v. AVX Corp., 962 F.2d 108, 113 (1st Cir. 1992) ("If a party lacks standing to bring a matter before the court, the court lacks jurisdiction to decide the merits of the underlying case."); Wilkinson v. EMC Mortgage (In re Wilkinson), Case No. 07-50189, Adv. P. No. 11-05056, 2012 WL 112945 at *4 (Bankr. W. D. Tex. Jan. 12, 2012) (same).   Rule 13(a) of the Massachusetts Rules of Civil Procedure governs compulsory counterclaims.   It provides:

(a) Compulsory Counterclaims. A pleading shall state as a counterclaim any claim for relief the court has power to give which at the time of serving the pleading the pleader has against any opposing party, if it arises out of the transaction or occurrence that is the subject matter of the opposing party's

claim and does not either require for its adjudication the presence of third parties over whom the court cannot acquire jurisdiction or constitute an action required by law to be brought in a county or judicial district, as the case may be, other than the county or judicial district in which the court is sitting. But the pleader need not state the claim if (1) at the time the action was commenced the claim was the subject of another pending action, or (2) the opposing party brought suit upon his claim by attachment or other process by which the court did not acquire jurisdiction to render a personal judgment on that claim, and the pleader is not stating any counterclaim under this Rule 13, or (3) if part or all of the pleader's claim is based upon property damage arising out of a collision, personal injury, including actions for consequential damages, or death. In actions in the Land Court for registration and confirmation pursuant to G.L. c. 185, and tax title foreclosures, brought pursuant to G.L. c. 60, no party may assert a counterclaim under this subdivision or subdivision (b), except by leave of court.

Mass. R. Civ. P. 13(a).  It is similar in its wording to the Fed. R. Civ. P. 13(a), made

applicable to this proceeding by Fed. R. Bankr. P. 7013. *See* <u>Tapalian v. Town of Seekonk</u>,

188 F.Supp.2d 136, 138 (D. Mass. 2002).  The 1973 Reporter's Notes for Mass. R. Civ. P.

13(a) provide:

Classification of a counterclaim as compulsory or permissive depends in turn upon a definition of "transaction or occurrence." The word "transaction", in the present context, has been defined thus: "'[A] transaction is where both causes of action proceed from the same wrong.'" <u>Potier v. A.W. Perry, Inc.</u>, 286 Mass. 602, 608, 190 N.E. 822, 824-825 (1934). As the court there suggested, the governing rule "should be construed in a sense to effectuate the settlement in one proceeding of controversies so closely connected as appropriately to be combined in one trial in order to prevent duplication of testimony, to avoid unnecessary expense to the parties and to the public, and to expedite the adjudication of suits." Interpreting the old Federal Equity Rule 30, the United States Supreme Court expressed a similar view: "'Transaction' is a word of flexible meaning. It may comprehend a series of many occurrences, depending not so much upon the immediateness of their connection as upon their logical relationship." <u>Moore v. New York Cotton Exchange</u>, 270 U.S. 593, 610, 46 S.Ct. 367, 371, 70 L.Ed. 750 (1926). Approximately the same meaning should be assigned to the phrase "transaction or occurrence", as it appears in Rule 13(a). "The use of the word 'occurrence' in the rule in connection with the

word 'transaction' can serve no other purpose than to make clear the meaning of the word 'transaction.' . . . The word 'transaction' commonly indicates an act of transacting or conducting business but in the rule under consideration it is not restricted to such sense. It is broad enough to include an occurrence. . . . The words 'transaction' and 'occurrence' probably mean, whatever may be done by one person which affects another's rights and out of which a cause of action may arise. . . . *A familiar test may be applied by inquiring whether the same evidence will support or refute the opposing claims.*" Williams v. Robinson, 1 F.R.D. 211, 213 (D. D.C. 1940).

Even though a given counterclaim arises out of the transaction or occurrence that underlies the plaintiff's claim, it may still avoid being labelled compulsory, provided one of the following conditions obtains:

(a) The court lacks power to confer the relief sought.

(b) *The defendant does not have the claim at the time he serves his answer. Any later-blooming claims may be asserted by way of appropriate amendment, either under Rule 13(e) or Rule 15(a).*

(c) To award relief upon the counterclaim, the court would require the presence of parties over whom it cannot acquire jurisdiction.

d) The counterclaim is already the subject of an action by the present defendant against the present plaintiff. . . .

(e) The plaintiff commenced his action by process which did not subject the defendant to an unlimited judgment.  . . .

(f) If part or all of the pleader's claim is based upon property damage arising out of a collision, personal injury, including actions for consequential damages, or death. . . .

Mass. R. Civ. P. 13(a), 1973 Reporter's Notes (emphasis supplied).

Because Mass. R. Civ. P. 13(a) and Fed. R. Civ. P. 13(a) are similar, this Court may look to federal law for guidance.  The First Circuit has adopted four tests to determine whether a counterclaim is compulsory under Rule 13(a):

(1) Are the issues of fact and law raised by the claim and counterclaim largely the same?

(2) Would res judicata bar a subsequent suit on defendant's claim absent the compulsory counterclaim rule?
(3) Will substantially the same evidence support or refute plaintiff's claim as well as defendant's counterclaim?
(4) Is there any logical relation between the claim and the counterclaim?

Iglesias v. Mutual Life Ins. Co., 156 F.3d 237, 241 (1st Cir. 1998), *cert. denied,* 528 U.S. 812 (1999). "Under the 'logical relation' test, a counterclaim is compulsory only if 'it arises out of the same aggregate of operative facts as the original claim in two senses: (1) that the same aggregate of operative facts serves as the basis of both claims; or (2) that the aggregate core of facts upon which the original claim rests activates additional legal rights in a party defendant that would otherwise remain dormant.'" Id., at 241–242. *See also* Commerce Ins. Co. v. Commerce Bancorp, Inc., Case No. 06-10326-PBS, 2007 WL 7309742, at *2 (D. Mass. June 1, 2007), *report and recommendation adopted*, No. 1:06-CV-10326, 2007 WL 7310425 (D. Mass. June 12, 2007). If one of these tests is satisfied and a counterclaim is not pled, it is barred. M.D. Moody & Sons, Inc. v. Dockside Marine Contractors, Inc., 549 F.Supp.2d 143, 147 n.4 (D. P.R. 2007).

Based upon the allegations set forth in the Trustee's and this Court's review of the exhibits attached to that Complaint and LexMar's Motion to Dismiss, including LexMar's Verified Complaint, the Court concludes that it cannot answer "yes" to the questions posed above. Thus, LexMar's argument that application of Mass. R. Civ. P. 13(a) precludes the Trustee's successor liability claim is devoid of merit.

Even if a successor liability claim by Progression were to be considered a compulsory counterclaim, however, this Court concludes it had not matured at the time Progression was required to file its Answer to the Verified Complaint filed by LexMar on

22

November 4, 2014.  LexMar commenced its action against Progression, Davis and Davidson less than two months after the Secured Party Sale.  Its specific claims against Progression involved failure to execute assignments of intellectual property and failure to pay the deficiency owed after the Secured Party Sale.  Moreover, Progression's Answer was filed less than three months after the Secured Party Sale at a time when its CEO and President, Davidson, had resigned his positions (i.e., on September 12, 2014) and was engaged, without pay, to wind down the Debtor's affairs and was required to defend himself against LexMar's claims.

In Tapalian v. Town of Seekonk, 188 F.Supp.2d 136, 138 (D. Mass. 2002), the court observed:

> The purpose of the compulsory counterclaim rule is "to prevent multiplicity of actions and to achieve resolution in a single lawsuit of all disputes arising out of common matters." Carteret Sav. & Loan Ass'n v. Jackson, 812 F.2d 36, 38 (1st Cir. 1987). "The scope of 'transaction or occurrence' is liberally interpreted, as the court determines whether there is a logical relationship between the claim in suit and the counterclaim." Genentech, Inc. v. Regents of the Univ. of California, 143 F.3d 1446, 1456 (Fed.Cir.1998). "In making this determination, which invokes judicial discretion, the court may give weight to the advantages of consolidation, efficiency, and expedition. . . ." Id. "[Claim preclusion applies] even though the claimant is prepared in a second action to present different evidence or legal theories to support his claim or seeks different remedies." Heacock, 402 Mass. at 23, 520 N.E.2d 151. Courts have held claims to be compulsory counterclaims to earlier actions, and thus precluded, even though the later actions involved a different body of law and different remedies. See, e.g., In re Iannochino, 242 F.3d 36, 38 (1st Cir.2001) (holding that suit for professional malpractice was compulsory counterclaim to earlier award of fees in bankruptcy to debtor's attorney); Genentech, 143 F.3d at 1456 (holding claim for antitrust violation to be compulsory counterclaim to earlier suit for patent infringement); Pochiro v. Prudential Ins. Co., 827 F.2d 1246, 1251–53 (9th Cir. 1987) (holding former employee's claims for defamation, abuse of process, breach of employment contract and intentional interference with business relationship to be compulsory

counterclaims to employer's prior state court action for appropriating confidential consumer information).

There are several noteworthy caveats to these guiding principles. First, "the pleader need not state the claim if . . . at the time an action was commenced the claim was the subject of another pending action. . . ." Mass. R. Civ. P. 13(a). *See* Travenol Labs., Inc. v. Zotal, Ltd., 394 Mass. 95, 97 n. 4, 474 N.E.2d 1070, 1072 n. 4. Moreover, *"a party need not assert a counterclaim that has not matured at the time he served his pleading . . . . [and a] counterclaim acquired by the a [sic] defendant after he has answered is not compulsory, even if it arises out of the same transaction as does the plaintiff's claim."* Chestnut Hill Gulf, Inc. v. Cumberland Farms, Inc., 788 F.Supp. 616, 622 (D. Mass. 1992) (quoting Boston & Maine Corp. v. United Transp. Union, 110 F.R.D. 322, 328 (D.Mass.1986)) (internal quotations omitted).

Tapalian, 188 F.Supp.2d at 138-39 (emphasis supplied).[9]

The Court concludes, based upon the existing record, that the successor liability claim was not mature at the time Progression filed its Answer. The record is devoid of any evidence that the Secured Party Sale conducted on September 12, 2014 was invalid or defective for any reason, including lack of perfection or inadequate notice.

---

[9] The court in Tapalian added:

Under Massachusetts law, a dismissal with prejudice is "an adjudication on the merits as fully and completely as if the order had been entered after trial." Bagley v. Moxley, 407 Mass. 633, 637, 555 N.E.2d 229 (1990). "[A] stipulation of dismissal constitutes a final judgment." Craft v. Kane, 51 Mass. App. Ct. 648, 652, 747 N.E.2d 748 (2001). Federal courts must "give the same preclusive effect to a state-court judgment as would the courts of the State rendering the judgment." McDonald v. City of West Branch, Michigan, 466 U.S. 284, 287, 104 S.Ct. 1799, 1801, 80 L.Ed.2d 302 (1984). Accordingly, an action that would be dismissed by a Massachusetts court under the doctrine of claim preclusion must be dismissed in this Court as well.

Tapalian v. Town of Seekonk, 188 F. Supp.2d at 139. In contrast, the state court action was dismissed without prejudice.

Nevertheless, Progression, in its thirteenth affirmative defense reserved the right to "file such additional defenses and actions as may be appropriate." Moreover, the parties stipulated to the dismissal of the state court action *without prejudice*, and in the Stipulation referenced to "all claims and counterclaims." Accordingly, the voluntary dismissal without prejudice left the situation as if the action had never been filed. *See* Rockland Trust Co. v. Langone, 2007 Mass App. Div. 157, 2007 WL 3241637 at *2 (Mass. App. Div. Oct. 22, 2007), *aff'd,* 75 Mass. App. Ct. 1116 (2009), *review denied*, 455 Mass. 1110 (2010) (citing Morgan v. Evans, 39 Mass. App. Ct. 465, 469, 657 N.E.2d 764 (1995)). The state court docket reflects that there was no final determination of the merits of LexMar's Verified Complaint. Although Justice Billings issued a decision, on November 18, 2014 regarding LexMar's request for injunctive relief, referencing the employment of two key employees and a continuation of the business of Progression, other than that decision, the record in this adversary proceeding is devoid of information about the evidence presented in the state court pertinent to the decision and the judge's statement.

In Milliken & Co. v. Duro Textiles, LLC, 451 Mass. 547, 887 N.E.2d 244 (2008), the Supreme Judicial Court considered a successor liability claim. It observed:

> When analyzing a claim for successor liability under theories of "de facto merger" or "mere continuation" of the predecessor, *our focus is on whether one company has become another for the purpose of eliminating its corporate debt.* "Most jurisdictions, including Massachusetts, follow the traditional corporate law principle that the liabilities of a selling predecessor corporation are not imposed upon the successor corporation which purchases its assets, unless (1) the successor expressly or impliedly assumes liability of the predecessor, (2) the transaction is a de facto merger or consolidation, (3) the successor is a mere continuation of the predecessor, or (4) the transaction is a fraudulent effort to avoid liabilities of the predecessor." Guzman v. MRM/Elgin, 409 Mass. 563, 566, 567 N.E.2d 929

(1991). *See* <u>McCarthy v. Litton Indus., Inc.</u>, 410 Mass. 15, 21, 570 N.E.2d 1008 (1991). *See also* <u>Dayton v. Peck, Stow & Wilcox Co. (Pexto)</u>, 739 F.2d 690, 692 (1st Cir.1984) (construing Massachusetts law). *The public policy underlying the imposition of successor liability is the fair remuneration of innocent corporate creditors. See* <u>Cargill, Inc. v. Beaver Coal & Oil Co.</u>, 424 Mass. 356, 362, 676 N.E.2d 815 (1997).

<u>Milliken & Co.</u>, 451 Mass. at 556 (footnote omitted, emphasis supplied).  The court added:

The "de facto merger" theory of successor liability "has usually been applied to situations in which the ownership, assets and management of one corporation are combined with those of another, preexisting entity." <u>National Gypsum Co. v. Continental Brands Corp.</u>, 895 F.Supp. 328, 336 (D. Mass. 1995). "The factors that courts generally consider in determining whether to characterize an asset sale as a de facto merger are whether (1) there is a continuation of the enterprise of the seller corporation so that there is continuity of management, personnel, physical location, assets, and general business operations; whether (2) there is a continuity of shareholders which results from the purchasing corporation paying for the acquired assets with shares of its own stock, this stock ultimately coming to be held by the shareholders of the seller corporation so that they become a constituent part of the purchasing corporation; whether (3) the seller corporation ceases its ordinary business operations, liquidates, and dissolves as soon as legally and practically possible; and whether (4) the purchasing corporation assumes those obligations of the seller ordinarily necessary for the uninterrupted continuation of normal business operations of the seller corporation." <u>Cargill, Inc. v. Beaver Coal & Oil Co.</u>, *supra* at 359–360, 676 N.E.2d 815. *See* 15 W.M. Fletcher, Cyclopedia of Corporations § 7124.20, at 294-295 (rev.perm. ed. 2008) (discussing elements of "de facto merger"). We have stated that "[n]o single factor is necessary or sufficient to establish a de facto merger." <u>Cargill, Inc. v. Beaver Coal & Oil Co.</u>, *supra* at 360, 676 N.E.2d 815.

The "mere continuation" theory of successor liability "envisions a reorganization transforming a single company from one corporate entity into another." <u>McCarthy v. Litton Indus., Inc.</u>, *supra* at 21–22, 570 N.E.2d 1008. *See* <u>National Gypsum Co. v. Continental Brands Corp.</u>, *supra* (seller establishes buyer for purpose of continuing business under new form). *See also* 15 W.M. Fletcher, supra at § 7124.10, at 282-283 (discussing elements of "continuation of business" theory). "[T]he indices of a 'continuation' are, at a minimum: continuity of directors, officers, and stockholders; and the continued existence of only one corporation after the sale of assets." <u>McCarthy v. Litton Indus., Inc.</u>, *supra* at 23, 570 N.E.2d 1008. In essence, the

purchasing corporation "is merely a 'new hat' for the seller." Id. at 22, 570
N.E.2d 1008, quoting Bud Antle, Inc. v. Eastern Foods, Inc., 758 F.2d 1451,
1458 (11th Cir. 1985). "[T]he imposition of liability on the purchaser is
justified on the theory that, in substance if not in form, the purchasing
corporation is the same company as the selling corporation." McCarthy v.
Litton Indus., Inc., *supra*. *See* 15 W.M. Fletcher, supra at § 7124.10, at 287
("The 'mere continuation' of business exception reinforces the policy of
protecting rights of a creditor by allowing a creditor to recover from the
successor corporation whenever the successor is substantially the same as
the predecessor"). Similar to the considerations underlying a finding of a
"de facto merger," the factors characterizing a continuing corporation are
traditional indicators, but no single factor is dispositive, and the facts of
each case must be examined independently. *See* 15 W.M. Fletcher, *supra* at
§ 7124.10, at 283–287.

Milliken & Co., 451 Mass. at 557-58.   As evident from the Supreme Judicial Court's

discussion, to establish successor liability, a moving party must focus on "whether one

company has become another for the purpose of eliminating its corporate debt." Id. at

556.   Moreover,

> Under Massachusetts law, a de facto merger does not occur absent a
> showing that there is a continuity of shareholders or other type of
> transaction that ultimately makes [the selling] shareholders directly or
> indirectly constituent owners of . . . the purchasing corporation. Goguen v.
> Textron Inc., 476 F.Supp.2d 5 (D. Mass. 2007) (Saylor, J.). This same
> conclusion is obtained under the "mere continuation" exception. McCarthy,
> 410 Mass. at 23, 570 N.E.2d 1008 (reaffirming that "the indices of a '[mere]
> continuation' are, at a minimum: continuity of directors, officers, and
> stockholders; and the continued existence of only one corporation after the
> sale of assets" (emphasis added)).

DeJesus v. Bertsch, Inc., 898 F. Supp. 2d 353, 361–62 (D. Mass. 2012), *aff'd sub nom*. DeJesus

v. Park Corp., 530 F.App'x 3 (1st Cir. 2013).   The case law makes it clear that any departure

from the traditional corporate law principle that the liabilities of a selling predecessor

corporation are not imposed on a purchaser, let alone the acquirer of assets at a secured

party sale under the Uniform Commercial Code, is an extraordinary remedy.   The

imposition of successor liability, because it is the exception rather than the rule, requires evidence that would be different than the evidence LexMar produced or would have had to have been prepared to produce in the state court to establish that Progression breached its contract by failing to execute assignments of its Intellectual Property and paying the deficiency under the secured loan. The organization headings in LexMar's Verified Complaint reveal its focus - - enjoining Davidson's and Davis's violations of contractual agreements - - an entirely different focus than one pertinent to the imposition of successor liability.

Because there was no final judgment on the merits in the state court action as the action was dismissed without prejudice, the doctrine of res judicata, at first blush, does not apply to this case.  As the United States Court of Appeals for the First Circuit noted, however, "this principle is subject to two important exceptions that narrow its applicability and reduce the potential waste of judicial resources and costs to the parties associated with multiple suits based upon the same facts." Iannochino v. Rodolakis (In re Iannochino), 242 F.3d 36, 41 (1st Cir. 2001).  The first exception applies to compulsory counterclaims and the second exception "is applicable when the 'relationship between the counterclaim and the plaintiff's claim is such that successful prosecution of the second action would nullify the initial judgment or would impair rights established in the initial action.'" Id. at 42 (citing Restatement (Second) of Judgments § 22(2)(b)(1982)).  The Court has determined, however, that to the extent that Progression may have had a successor liability claim, that claim was premature at the time it filed its Answer to LexMar's Verified Complaint, or that it is not precluded because of the dismissal of the state court

action without prejudice.   Based upon the Verified Complaint and the evidence summarized above, this Court cannot conclude that the Secured Party Sale upon which LexMar based its claims in 2014 would have permitted Progression to formulate a successor liability claim, particularly as there is no evidence as to the timing of LexMar's alleged wholesale take over of Progression's website, sales and service agents, and service locations or what arrangement LexMar made with Progression's co-founder, Scott Marino.

## V. CONCLUSION

In view of the foregoing and because "successor liability is an equitable doctrine, both in origin and nature," *see* Ed Peters Jewelry Co. v. C & J Jewelry Co., 124 F.3d 252, 267 (1st Cir. 1997), the Court shall enter an order denying LexMar's Motion to Dismiss. With respect to LexMar's subsidiary argument that the successor liability claim cannot be asserted on behalf of non-innocent creditors, the Court concludes that any consideration of that argument is best addressed in the claims objection process and is not grounds for dismissal of the Plaintiff's Complaint.

By the Court,

Joan N. Feeney
United States Bankruptcy Judge

Dated:  September 30, 2016